Filed 6/29/26  P. v. Rodriguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>EDMUNDO ANTHONY RODRIGUEZ,<br><br>        Defendant and Appellant. | F089091<br><br>(Super. Ct. No. CF01662053)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Heather Mardel Jones, Judge.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, Christina Simpson and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Edmundo Anthony Rodriguez appeals a trial court order denying his resentencing petition under Penal Code section 1172.6 after an evidentiary hearing. He contends the trial court erred by (1) refusing to consider his misidentification theory and new evidence at the evidentiary hearing; (2) finding he was the actual killer because a 2001 jury found not true a personal and intentional firearm use enhancement (§ 12022.53, subd. (d)); and, (3) finding, alternatively, that if he was not the shooter, he was a direct aider and abettor, which appellant claims is not supported by substantial evidence.

The Attorney General maintains the trial court properly declined to consider Edmundo's new alibi evidence because the scope of a section 1172.6 evidentiary hearing does not extend to claims of factual innocence unconnected to the changes in the law regarding murder liability. The Attorney General also contends there is substantial evidence to support Edmundo's liability for murder under either a direct perpetrator theory or a direct aiding and abetting theory, and he maintains the trial court is not estopped from finding Edmundo was the shooter under the issue preclusion doctrine.

For the reasons explained below, the trial court did not err in declining to consider Edmundo's alibi evidence. Further, although we find no substantial evidence to support the trial court's alternative finding that Edmundo was guilty of felony murder as a major participant under section 189, subdivision (e)(3), substantial evidence does support the trial court's finding that Edmundo remains guilty of murder beyond a reasonable doubt as a direct aider and abettor who acted with express malice. We affirm the trial court's order denying resentencing relief under section 1172.6, and we do not reach the parties' issue preclusion arguments.

# BACKGROUND

## I.      Factual Background[1]

After Travone Polk was shot and killed in the early hours of May 31, 2001, half brothers Edmundo and Ernesto Rodriguez were charged with his murder.  By amended information, the murder was alleged to have been committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)); and it was alleged Edmundo and Ernesto were principals in the offense, and in the commission of the offense, at least one principal intentionally and personally discharged a firearm, which proximately caused great bodily injury or death to Polk within the meaning of section 12022.53, former subdivisions (d) and (e)(1).[2]  Further, it was alleged that Edmundo personally and intentionally discharged a firearm, which proximately caused great bodily injury or death to Polk within the meaning of section 12022.53, subdivisions (d) and (e)(2).

Ernesto and Edmundo were tried together in November and December 2001 during which the following evidence was introduced.

---

[1]      The original trial transcript was admitted at Edmundo's section 1172.6 evidentiary hearing, and we granted Edmundo's request for judicial notice of the record in Edmundo's prior appeal (*People v. Rodriguez* (Sept. 28, 2003, F040241) [nonpub. opn.]).  The factual background is drawn from the original trial transcript, which is part of the record on appeal in Edmundo's direct appeal after conviction.

[2]      In 2001, section 12022.53, former subdivision (d) provided, "Notwithstanding any other provision of law, any person who is convicted of a felony specified in subdivision (a), …, and who in the commission of that felony intentionally and personally discharged a firearm and proximately caused great bodily injury, …, to any person other than an accomplice, shall be punished by a term of imprisonment of 25 years to life in the state prison, which shall be imposed in addition and consecutive to the punishment prescribed for that felony."  Section 12022.53, former subdivision (e)(1), provided, "The enhancements specified in this section shall apply to any person charged as a principal in the commission of an offense that includes an allegation pursuant to this section when a violation of both this section and subdivision (b) of Section 186.22 are pled and proved."  (See Stats. 2000, ch. 287, § 23.)

Under these subdivisions, "to find an aider and abettor—who is not the shooter—liable under section 12022.53, subdivision (d), the prosecution must plead and prove that (1) a principal committed an offense enumerated in section 12022.53, subdivision (a), …; (2) a

## A.     Confrontation with Maurice Woods

Maurice, a Northside Six Deuce Diamond Crips gang member, was living at the Villa Sante Fe Apartments in May 2001, and he was friends with Travone Polk (also known as Boogie), who was also living in the complex at that time in a second floor apartment, number 239.  On the morning of May 30, 2001, Maurice went to Polk's apartment for a visit, and found Polk getting a tattoo from a tattoo artist (later identified as Israel), who Maurice didn't know but had seen before at the apartments.  They smoked some marijuana, drank beer, and Maurice left after about 35 to 40 minutes.

Later in the day, two of Maurice's friends, one of whom was also a Six Deuce Diamond Crips member (Bivens) and one who associated with that gang (Jermane), stopped by his apartment, and Maurice told them tattoos were being done in Polk's apartment, so the group went to Polk's apartment.  On their way to Polk's, Maurice saw "a couple guys" standing by the stairs near apartment 159.  The group included Edmundo, whom Maurice recognized as an Eastside Fresno Bulldog gang member and had seen around the apartment complex.  Edmundo started making comments about Maurice, kept "throwing Dog" into every sentence, and taunted Marice about wearing his pants too low along with other derogatory statements.  After a heated exchange, Maurice and his friends continued to Polk's apartment.

Inside Polk's apartment, which overlooks a large square courtyard, Maurice could hear a whole crowd taunting them from below, and Maurice told Polk's niece Myeisha to close the blinds.  According to Maurice, Polk was gone and only Myeisha was home, but about 45 seconds after Maurice got there, Polk called.  Polk told Maurice he did not want

---

principal intentionally and personally discharged a firearm and proximately caused great bodily injury or death to any person other than an accomplice during the commission of the offense; (3) the aider and abettor was a principal in the offense; and (4) the offense was committed 'for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members [citations.]'" (*People v. Garcia* (2002) 28 Cal.4th 1166, 1174.)

4.

anything going on at his house. Maurice and Jermane both called some of their gang friends. After this call, Maurice and his friends went downstairs and out to the parking lot where they met about 11 people who had responded to their calls.

## B.     Fight in the Courtyard

Maurice's group of 11 then approached about eight or nine Bulldog members near apartment 159, and they began arguing. One of the Bulldog members had a bat, but Maurice didn't see any other weapons. Edmundo and Ernesto were in the group of Bulldogs; Jermane's brother started fighting Ernesto, and Ernesto was knocked down. After the fight, Maurice's group left and went across town.

Myeisha testified she had been alone in the apartment she shared with Polk for a couple of hours before the fight. Polk had gone to the hospital for problems with his asthma, and he called later in the afternoon to say he was on his way home. Maurice showed up with two other men around the time of Polk's phone call, and he wanted to talk to Polk. Maurice came into the apartment to use the phone; she heard Maurice say the dogs were barking. Maurice left with the two men after about five minutes, and about 10 to 20 minutes later she saw Maurice walk up "to the Mexican" "with a gang of [B]lack dudes .…" She looked through the sliding patio doors, and she heard arguing. She heard someone yell that there were guns, and she saw "a Mexican dude" with a bat, but the "[B]lack people" ended up with the bat. After that, she saw Maurice's brother run up from the direction of Polk's apartment, and started "jumping around" on a man she later identified as Ernesto. She recognized Ernesto from around the complex, but she didn't know him. Another Hispanic man came to pick up the beaten man—she also recognized him from the complex.

Duan was staying at his mother's apartment in the complex at the time of the fight. He was at a neighbor's apartment when he heard some arguing, so he came out and told people to stop because there were kids outside. Duan noted Ernesto was "mad about something," and, by the time Duan arrived, there was a Hispanic gang and a Black gang

5.

arguing. He heard Ernesto yell "'Fuck Six Diamond Deuce,'" and suddenly, "a guy" came up and knocked Ernesto out—this person had run from the area near Polk's apartment; he was Black, and Duan did not know him. Duan saw Edmundo help get Ernesto back to apartment 159.

After the fight, Duan was in front of an apartment where Ernesto and some of his friends were talking. Ernesto was mad, and he thought the guy who beat him up had come from Polk's apartment. Edmundo was also present. Duan heard Ernesto say, "'Fuck Boogie, it's on.'" Duan told them it had nothing to do with Boogie, but there was no response; they just wanted payback. Duan later talked to Myeisha in Polk's apartment; Polk was gone. They stood on the apartment balcony, and three Hispanic men walked up and started yelling about gangs and barking like Bulldogs.

E.T. was also living at the complex and observed the fight sometime after 5:00 p.m. She was outside on her patio where she could see the whole lawn area of the complex. She saw two "[B]lack guys"; one "[B]lack guy" was fighting with "one of the Mexican guys .…" The Black man hit the Hispanic man, and he fell down, and the Black man started kicking him in the head. Others just stood around watching, and no one was stopping the fight, so E.T. called 911. She told the dispatcher that if someone did not come, the person getting kicked in the head was going to die. She thought the man getting kicked was Ernesto—she had seen him around the complex, but she did not know his name—she heard later from another tenant that his name was Ernesto. Another Hispanic man helped Ernesto up—she thought that man was wearing a white tank top, and she thought it could have been Edmundo, but she was uncertain.

Duan's mother, L.C., was emptying the trash when a woman told her to call the police because there was a fight. She did not hear any aspect of the fight, but her apartment is close to apartment 159, and she heard Ernesto and Duan talking after the fight. Duan said Polk/Boogie had nothing to do with it. She left for the store shortly after she heard this, and stayed out until about 9:00 p.m.

Around 7:00 p.m., after the fight, Israel, the tattoo artist who lived at the complex, saw Edmundo; he was angry about the fight because Ernesto got hurt. Edmundo told Israel there was going to be a fight if Edmundo's group saw Maurice. When Israel went back to Polk's apartment that night, he told Polk and Myeisha what he had heard about the fight, but he did not say anything to them about what Edmundo had said to him.

C.      Shooting of Travone Polk

Myeisha testified that after the fight, Polk returned from the hospital. Israel came to the apartment that evening and told them the Hispanic men involved in the fight were going to come kick in Polk's door. Israel left the apartment to get a cigarette and said he would talk with the Hispanic men, but he never returned to the apartment that night. Maurice called after Israel left. Later, Polk was cooking something, and Myeisha and Polk were sitting on the stairs talking outside of their apartment; Myeisha's children were asleep inside. They both went back into the apartment while Polk was checking on the food he was preparing. When they walked back to the door to sit on the landing again while Polk ate, she saw men creeping against the wall coming up the stairs. Myeisha was behind Polk, and he was fairly close to the door, but still inside the apartment. Three Hispanic men met Polk at the door, and one of them had a gun pointed at Polk; Polk grabbed for the gun and said something like, "'Nah, man ….'" She saw faces first, and then she saw a silver gun pointed at Polk; she turned and ran. She testified the person with the gun she knew from the apartment; he was wearing a red shirt with some "Dickey" overalls with blue stripes and was bald-headed. The second person had a white tank top with some black jeans and white Filas tennis shoes; the third person had a white tank top with beige pants. At trial, she identified Ernesto as the person with the gun and Edmundo as the person standing behind him. She did not see the face of the third person.

As soon as she saw Polk grab the gun, she ran toward the sliding glass door, knocking the screen down in her haste to get out. She started yelling from the balcony to

help her kids. When she looked back, she saw the people who had shot her uncle were running back toward apartment 159.

Duan's mother, L.C., was barbequing food for a party the next day and talking to another woman when she heard two or three shots fired, and she heard someone yelling, "'[T]hey shot my baby.'" Both women ran back to their respective apartments. L.C. called the police and, while she was on the phone, she saw a group of men running from near Polk's apartment to the breezeway near apartment 159. She told police the group was running down East Huntington, and they had cut through the apartments, but she saw Edmundo specifically when he turned and looked at her. She didn't see Edmundo wearing anything that looked like suspenders. She described the group she saw to the 911 dispatcher as Hispanic and wearing red shirts.

E.T. also heard five or six shots from her apartment when she was about to close the window. She saw five people running from the direction of Polk's apartment, but she did not recognize anyone. They were Hispanic and wearing T-shirts, but she could not remember what color—either white or red. After the shots were fired, she heard someone yelling, "'[T]hey killed my baby.'"

R.M., another tenant, was awakened by the sound of two gunshots; she looked out the window and saw a young man walking calmly, and then he went over a fence and got into a car. She saw something shiny in his hand, he was wearing a white tank top with blue or black pants, and he was bald. She saw a blue flower tattoo on his shoulder, and she thought he had been watching the fight earlier. She identified this man as Ernesto in her direct examination, but when Ernesto was asked to remove his shirt during cross-examination, she did not see the tattoo she remembered on the person she had seen that night, and said she was unsure of her identification. She also testified it was not Edmundo she had seen jumping over the fence, and she did not see any tattoos on Edmundo that she had seen on the person who she saw jumping the fence, either.

8.

### D. Postshooting Investigation and Identification of Shooting Participants

Officer Edwards was dispatched to the apartment complex and was informed enroute that suspects were last seen running east on Huntington Boulevard wearing red shirts, and that they were possibly Bulldog gang members. In his patrol car near the apartment complex, Edwards saw a subject later identified as Ernesto walking on the street and breathing heavily. He appeared to be sweating, and he had a red shirt draped over his left shoulder. He had a Bulldog tattoo on his abdomen, and his pants were dirty. Edwards detained Ernesto and, while patting him down, found an empty gun holster and a pager. Ernesto was detained 10 minutes after the shooting.

Ernesto told the officer he had found the holster hours earlier, and that he was just walking in the area and going to a fast food restaurant. Ernesto's hair was short, but it was not shaved bald. Myeisha was transported by an officer to do an infield show-up of Ernesto and another detained individual. When Myeisha was shown Ernesto during the infield show-up, she noted that he had been at the apartment complex and involved in an altercation there, but he was not the person she had seen with the gun or at the apartment.

Meanwhile, Detective Wells was called to the shooting. A search warrant was executed at apartment 159; it was leased to Isaac Beltran. Materials were found inside the apartment that showed a connection to a gang, including a gang roster that listed monikers, paper drawings of Bulldogs, and numerous photographs of individuals displaying gang signs and wearing gang clothing. Police also found seven .38-caliber bullet casings in the back bedroom in a plastic bag. The apartment was filthy, there were dog feces all over the carpeted area, and trash was scattered about. There was little to no furniture, and there was no electricity, gas or water.

During an interview, Ernesto told Wells he had learned about the shooting for the first time when he was detained by the police; he had been at apartment 159 earlier in the day. He admitted to being a Bulldog gang member, and he had a broken lip and scratches on his upper torso. When asked if he had been in a fight, he said it was just a

9.

misunderstanding with a Black Crips member at the apartments between 4:00 and 5:00 in the afternoon.

Wells also interviewed Myeisha, and around 7:30 the morning after the shooting he showed her a photographic lineup that included Ernesto. Wells was unaware Myeisha had already participated in an infield show-up that included Ernesto and had not identified him. When she saw the photographic lineup, she became visibly shaken and tearful when she saw Ernesto. She identified him as the shooter. Wells met with her on multiple subsequent occasions to look at other photographic lineups. In a second photo lineup that included Ernesto, she did not identify him. When she viewed a fifth lineup that included Edmundo because of clothing she had indicated the shooter had been wearing, she identified Edmundo. She said the person she had previously identified as the shooter (Ernesto) had been a mistake, and she believed Edmundo was the shooter. Wells testified that at the time of the shooting, Ernesto had a close-cut haircut like a buzz cut, and Edmundo's hairstyle was a little longer.

### E. Additional Trial Evidence

When Wells interviewed Israel, he told Wells that he had overheard Edmundo making a statement after the fight that he was going to do something to some Crips as payback; Israel said Edmundo was "agitated." Israel described Edmundo as Hispanic, 20 years old, shaved head with a tattoo of a dog paw on his chest. He was wearing a white shirt and blue denim trousers, but Israel said nothing about overalls with stripes. Israel told Wells he had been in Polk's apartment just moments before the shooting, and he had left to get a cigarette with intentions to return immediately.

Senior forensic pathologist Venu Gopal completed Polk's autopsy on June 1, 2001. He found four gunshot wounds: one to the right side of the neck; a second to the right side of the neck; a third to the outer aspect of the right shoulder; and a fourth in the left gluteal region. There was stippling only around the shoulder wound, which meant the gun had been anywhere from 0.5 inches to 30 inches away when that shot was fired.

The first gunshot wound to the neck exited at the right temporal region near the hairline; there was no stippling at this entry wound. The second wound in the neck lodged and did not exit the body. That wound severed major arteries including the carotid arteries. The fourth gunshot wound to the buttock went through muscle and then lodged in the third lumbar vertebra. There was no stippling at the entrance. The trajectory of this bullet indicated Polk was most likely bending forward when he was shot—he could have been falling down or crouching at the time. Ultimately, Polk's death was caused by the perforation of the left internal and external carotid arteries from the neck gunshot wound.

The People elicited testimony from Detective Jesse Ruelas as a gang expert. He testified the Six Deuce Diamond Crips are a Black gang, and they are rivals of the Eastside Fresno Bulldogs—a Hispanic gang, but they can co-exist unless there is an episode of disrespect. He opined the various pictures and documents found in apartment 159 were gang related, and they tied Ernesto and Edmundo to membership with the Eastside Fresno Bulldogs. Based on that and other evidence, Ruelas opined Ernesto and Edmundo were active Eastside Fresno Bulldog members. Ruelas also testified how comments like those made to Maurice would be enough to inflame a gang incident, and might be enough to start a fight or result in the use of a deadly weapon. Where a gang member is beaten down by a rival, Ruelas opined that would cause a loss of respect and would not be accepted; there would be some form of payback or retaliation in response. Ruelas explained sometimes that payback may or may not be proportional to the inciting incident. Instances of retaliation associated with the Fresno Bulldog gang ranged from homicide to fights. He also explained payback does not necessarily need to be targeted at the rival gang—if someone is perceived to have helped a rival gang, that can inspire retaliation against that individual even if that person is not a gang member.

Dr. Joseph Sharps testified on behalf of Edmundo about the reliability of eyewitness testimony. According to Sharps, there are a variety of factors that affect the

reliability of eyewitness testimony, including the arousal of the witness, whether the witness is the same race as the subject, the presence of a weapon, and whether the witness had a chance to see the subject before the event as that can confuse who the witness thinks he or she saw and cause unconscious transference; and drugs and alcohol will also affect reliability.  He opined this case has probably as many factors tending against reliability as he had ever seen.  Moreover, there was an initial infield show-up including Ernesto before the first photo lineup that included Ernesto, and Sharps explained that once the witness has multiple observations of the same individual, it clouds where the identification is coming from.

### F.      Instructions and Closing Arguments

Among other instructions, the jury was instructed on first and second degree murder, and direct aiding and abetting principles; no felony murder or natural and probable consequences doctrine instructions were given.

In closing argument, the prosecutor theorized Edmundo was the shooter who acted with premeditation and deliberation, and Ernesto accompanied Edmundo to Polk's apartment as an aider and abettor.  The prosecutor argued the two had been heard angrily discussing payback for the fight where Ernesto was beaten, and that the two planned the shooting as reprisal because they thought Polk was involved with the person who beat Ernesto during the fight.  The manner of the shooting indicated an intent to kill because of the number of shots fired, and the pathologist's and the detective's testimony about the nature of the gunshot wounds showed an intent to kill:  Polk was shot multiple times—he had wounds to the neck, shoulder and buttocks; there was stippling on only one wound, suggesting Polk was retreating when he was shot additional times; and Polk was likely turned away and bent over when he was shot in the buttocks, suggesting the shooting was not the accidental result of Polk grabbing for the gun.

Edmundo's counsel argued Myeisha misidentified Edmundo as one of the three men she saw come to Polk's apartment.  Counsel argued Myeisha's identifications could

12.

not be trusted for a variety of reasons, including because they were inconsistent, and she was more focused on the gun than she was on identifying the men who showed up at the apartment.

### G. Verdict, Motion for a New Trial and Sentencing

The jury found Edmundo guilty of second degree murder, it found true the murder was committed for the benefit of a street gang under section 186.22, subdivision (b)(1), and that a principal had personally and intentionally discharged a firearm during the commission of the crime (§ 12022.53, former subds. (d) & (e)(1)). However, the jury found *not true* that Edmundo personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (d) and (e)(2).

Edmundo's motion for a new trial, based on newly discovered alibi evidence from Yolanda Fuentes, was denied by the trial court. Edmundo was sentenced to an aggregate term of 40 years to life (15 years to life for the murder, and 25 years to life for the firearm/gang enhancement under § 12022.53, former subds. (d) and (e)(1)). A 10-year sentence was imposed and stayed under section 186.22, subdivision (b)(1).

On direct appeal, the stayed sentence under section 186.22 was stricken under section 12022.53, subdivision (e)(2), but otherwise the judgment was affirmed. (*People v. Rodriguez, supra*, F040241.)

## II. Resentencing Procedural Background

In September 2020, Edmundo filed a petition for resentencing under what is now section 1172.6. He filed another resentencing petition in January 2022, which was denied at the prima facie stage. On appeal from that latter order, we reversed and remanded for an evidentiary hearing under section 1172.6, subdivision (d). (*People v. Rodriguez* (Oct. 3, 2023, F084165 [nonpub. opn.].)[3] The People filed an evidentiary hearing brief.

---

[3] In remanding for an evidentiary hearing, we concluded the implied malice murder instruction combined with the direct aiding and abetting instruction was confusing and it was reasonably probable the jury understood the instructions to mean malice could be imputed to a

13.

In August 2024, an evidentiary hearing was held where Edmundo presented alibi evidence from Yolanda Fuentes indicating she saw Edmundo at a friend's house passed out on the sofa just after midnight on the night of the shooting in 2001. Edmundo's counsel argued this testimony, along with the flaws in the identification testimony at Edmundo's original trial, indicated he was not present at Polk's apartment when Polk was shot. Alternatively, Edmundo's counsel argued even if he was present for the shooting, he was not the actual shooter, he did not know the shooting was going to happen, and he did nothing to encourage it—thus, he did not act with any malice, either express or implied. The prosecution asserted Edmundo was guilty as a direct aider and abettor and represented it was not pursuing a direct perpetrator theory. The court requested the defense file a supplemental brief on the alibi issue and whether it was relevant at a section 1172.6 evidentiary hearing, and set another hearing date for additional argument.

In October 2024, the parties appeared to present additional arguments regarding the alibi issue and its relevance to resentencing under section 1172.6. The People reiterated their position the alibi argument was outside the scope of section 1172.6, while the defense maintained all the elements of murder under a valid theory were placed at issue by the petition allegations, including whether Edmundo had been present at the time of the shooting. After hearing these brief arguments, the court indicated it would issue a written ruling, but also set a further hearing date in the event new and intervening decisional law significantly altered the analysis.

The trial court issued a written ruling denying the petition on October 30, 2024. The court found Edmundo's argument and new evidence (that he was not at the scene of

direct aider and abettor based solely on his participation in a crime. (See *People v. Langi* (2022) 73 Cal.App.5th 972, 976, 982–983; *People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1264– 1269; *People v. Powell* (2021) 63 Cal.App.5th 689, 712–714; accord, *People v. Lopez* (2026) 19 Cal.5th 639, 649, 666 [resentencing relief under § 1172.6 not precluded as a matter of law where jury could have interpreted jury instruction to allow conviction for murder under a theory of imputed malice].)

the shooting, and witnesses who saw him had misidentified him) to be outside the scope of section 1172.6:

> "A petition under section 1172.6 is not an appropriate vehicle to seek relief based on new evidence establishing factual innocence.  Although the parties may offer new or additional evidence at the hearing, 'section 1172.6, subdivision (d) does not contemplate a whole new trial on all the elements of murder.'  [Citation.]  Rather, the focus is on the effect of the changes to the substantive definition of murder on the instant case, with a[] focus on the malice requirement.  Namely, the amendment of Penal Code sections 188 and 189, which eliminated theories of murder and attempted murder liability based upon imputed malice.

> "The section 1172.6 evidentiary hearing is not a criminal prosecution, subsequent retrial, or a new sentencing.  [Citations.]  Rather, it is a post-conviction proceeding based on an act of lenity by the Legislature and not a criminal trial.  [Citation.]  What is at issue at a section 1172.6 evidentiary hearing is whether the People can prove beyond a reasonable doubt that the defendant is not eligible for relief under section 1172.6.  Until such time that the People fail to meet their burden, a defendant's final judgment of conviction is still intact and presumptively valid.  [Citation.]

> "Even if this court were to believe, for argument[']s sake, the testimony offered at the August 22, 2024 Evidentiary Hearing established that [Edmundo] is actually innocent of the crime, the challenge to his conviction on that basis would not be based on the 2019 changes to the law; rather, his claim would be based on the fact that he did not commit the crime under the law as it existed before and after the changes in the law.  That argument, therefore, does not support relief under section 1172.6.…  Claims of actual innocence based on new evidence are properly raised by petition for writ of habeas corpus.  [Citations.]  As such, [Edmundo's] argument at the August 22, 2024 Evidentiary Hearing, and in his Supplemental Brief, that he was not present at the murder and was factually innocent, (an argument also made by [Edmundo's] counsel at trial and soundly rejected by the jury), is not properly before this court as part of the Penal Code section 1172.6 Petition, and this court declines to address such an argument."

The court also reasoned, in relevant part, as follows:

> "From this court's review of the trial evidence, at least three individuals, … Edmundo Rodriguez, his half-brother and co-defendant Ernesto Rodriguez, and a third male, went to the victim Travone 'Boogie'

Polk's apartment as part of a plan to kill or shoot him in retaliation for the earlier-in-the-day rival gang beating of Ernesto. Witnesses described the group as angry and talking about revenge just before the murder, and heard Ernesto make a statement related to taking revenge—'Fuck Boogie. It's on.' Both Edmundo and Ernesto were identified as being at the scene of the murder at the time of the murder, creeping quietly up the stairs to the victim's doorway. Hours after the murder, an eyewitness who was two feet behind the victim at the time of his murder, identified … Edmundo as the shooter. At trial, the same eyewitness identified Ernesto as the shooter. At the time of the murder, … Edmundo was identified as running from the scene of the murder. Ernesto was also identified as running from the scene of the murder. A witness testified at trial that Ernesto had something 'shiny' in his hand. Ernesto was arrested nearby shortly after the murder, with an empty gun holster consistent with the caliber of gun used in the murder, in his pocket. … Edmundo was arrested sometime later. [¶] …[¶]

"Despite [Edmundo's] counsel's arguments at trial that [Edmundo] was not present at the time of the murder, similar to the claims by witness Yolanda Fuentes at the [section] 1172.6 Evidentiary Hearing, both the evidence admitted at trial and the jury verdicts soundly rejecting [Edmundo's] theory of the case, demonstrate otherwise. Indeed, under this court's independent review of the record, this court finds that the evidence and testimony at trial demonstrate beyond a reasonable doubt that [Edmundo] acted with malice aforethought—not imputed malice based on his participation in the crime.

"In this case, this court finds that the evidence demonstrates beyond a reasonable doubt, that [Edmundo] is ineligible for resentencing. There is sufficient evidence, beyond a reasonable doubt, to find that either [Edmundo] was the actual killer and acted with malice aforethought; or if [Edmundo] was not the actual killer, he harbored the intent to kill and he acted in order to aid, abet, or assist Ernesto in the commission of the murder; or at the very least, [Edmundo] was a major participant in the underlying felony—murder—and acted with reckless indifference to human life. In any of these scenarios, the evidence demonstrates beyond a reasonable doubt that [Edmundo] acted with malice aforethought that was not imputed based solely on participation in a crime.…"

Edmundo appeals the trial court's ruling.

16.

**DISCUSSION**

## I.    Senate Bill No. 1437 and Section 1172.6

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) was enacted "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  Senate Bill 1437 amended section 188, which defines malice, and section 189, which defines the degrees of murder to address felony-murder liability. (Stats. 2018, ch. 1015, §§ 2–3.)

Section 188 now provides that, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime." (*Id*., subd. (a)(3).)  The change reflects the Legislature's intent that "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).)

Senate Bill 1437 also added section 189, subdivision (e), to the Penal Code, which limits the circumstances under which a person may be convicted of felony murder:  "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [defining first degree murder] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (*Ibid*.)

Senate Bill 1437 also enacted what is now section 1172.6, creating a procedural mechanism "for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief" where the changes in the law affected the petitioner's conviction." (*People v. Gentile* (2020) 10 Cal.5th 830, 843.) Pursuant to section 1172.6, "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts …." (*Id.*, subd. (a).)

The resentencing process begins with filing a petition that contains a declaration that all requirements for eligibility are met (§ 1172.6, subd. (b)(1)(A)), including that the petitioner cannot presently be convicted of murder or attempted murder because of the 2019 changes in the law under Senate Bill 1437. (§ 1172.6, subd. (a); *People v. Strong* (2022) 13 Cal.5th 698, 708.) If the petitioner has made a prima facie case showing entitlement to relief, the court is to issue an order to show cause. (§ 1172.6, subd. (c); *Strong, supra*, at p. 708.)

"Within 60 days after the order to show cause has issued, the court shall hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence…." (§ 1172.6, subd. (d)(1).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as

amended by the changes to Section 188 or 189 made effective January 1, 2019.…" (*Id.*, subd. (d)(3).)

"Ordinarily, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence." (*People v. Reyes* (2023) 14 Cal.5th 981, 988; accord, *People v. Emanuel* (2025) 17 Cal.5th 867, 885.)

## II.    Misidentification/Alibi Theory Outside the Scope of Section 1172.6

Edmundo argues the trial court erred in denying his petition without considering his new alibi evidence and argument. Relying on *People v. Curiel* (2023) 15 Cal.5th 433 (*Curiel*), Edmundo contends that, in the context of section 1172.6, where a petitioner alleges he or she could not presently be convicted of a homicide offense because of the changes to the law, such an allegation puts at issue all elements of the offense under a valid theory. As such, Edmundo argues, whether he actually committed the offense (his innocence) is placed squarely at issue at a section 1172.6 evidentiary hearing, and he is entitled to present a new alibi defense.

The Attorney General maintains the trial court was not required to consider Edmundo's alibi evidence and argument because this issue was presented to the jury, and in reaching its second degree murder verdict, the jury necessarily decided Edmundo was present at the shooting scene—either as the shooter or as a direct aider and abettor. The Attorney General maintains section 1172.6 does not permit relitigating wholesale any new issue at the evidentiary hearing.

In reply, Edmundo argues this response does not acknowledge *Curiel* or its language indicating that a section 1172.6 petitioner who challenges his murder conviction "puts at issue all elements of the offense under a valid theory." (*Curiel, supra*, 15 Cal.5th at p. 462.) Edmundo contends this language signals the high court took "an expansive view on the issues that may be litigated at an evidentiary hearing, and intended that a petitioner be allowed to litigate such issues as whether he was even present at the scene of the crime."

19.

We decline to interpret or apply *Curiel*'s language to inform the scope of defenses that may be raised at a section 1172.6 evidentiary hearing. *Curiel* considered a denial at section 1172.6's prima facie stage, and specifically concerned what facts could be conclusively established, as a matter of issue preclusion, from certain jury findings after a trial where the jury had been instructed on an invalid theory. It did not involve an evidentiary hearing, and our high court did not confront or decide the scope of defenses that may be presented by a petitioner at an evidentiary hearing. "'"[L]anguage in a judicial opinion is to be understood in accordance with the facts and issues before the court."'" (*People v. Knoller* (2007) 41 Cal.4th 139, 154–155.) Thus, a "'decision is … authority … only "for the points actually involved and decided."'" (*Id.* at p. 155; accord, *People v. Gray* (2023) 15 Cal.5th 152, 169, fn. 5 ["'"[i]t is axiomatic that cases are not authority for propositions not considered"'"].)

Moreover, we do not understand, nor are we inclined to extend, the portion of *Curiel*'s language that Edmundo isolates to govern the scope of an evidentiary hearing. After being instructed on the now-invalid natural and probable consequences doctrine, a jury in *Curiel* convicted the petitioner (Curiel) of first degree murder, with a true finding on a gang-murder special circumstance allegation, a criminal street gang sentencing enhancement, two firearm enhancements, and he was convicted of active participation in a criminal street gang. (*Curiel, supra*, 15 Cal.5th at p. 440.) Curiel filed a resentencing petition under section 1172.6, alleging he could not currently be convicted of murder because of the change to sections 188 and 189. (*Curiel, supra*, at p. 440.) The trial court denied the petition at the prima facie stage, reasoning the jury found Curiel's intent to kill in finding true the special circumstance allegation, and this refuted Curiel's allegation he could not be convicted of murder under current law and precluded resentencing relief. (*Ibid*.)

The Court of Appeal reversed, and the California Supreme Court affirmed after granting review. (*Curiel, supra*, 15 Cal.5th at pp. 440–441.) Our high court held that

20.

while a jury's intent-to-kill finding made under the gang-murder special circumstance finding could be given preclusive effect at the prima facie stage, that finding *alone* did not conclusively establish Curiel had the sufficient mens rea and actus reus for murder liability as a direct aider and abettor—a valid theory the Attorney General argued the jury's verdict and special findings had encompassed.  (*Id.* at pp. 441, 464.)

The court rejected the Attorney General's narrow interpretation of section 188, subdivision (a)(3), and explained this subdivision had a broad effect on murder liability— it eliminated the doctrine of natural and probable consequences in its entirety, even with a showing of malice aforethought.  (*Curiel, supra,* 15 Cal.5th at pp. 462–463.)  As the entire theory was invalidated, murder liability after Senate Bill 1437 requires a different, valid theory—e.g., direct aiding and abetting.  A petitioner who alleges he or she cannot currently be convicted of a homicide offense "'because of'" the changes to section 188 or 189 "puts at issue all elements of the offense under a valid theory."  (*Curiel, supra*, at p. 462.)  The intent to kill finding is only *one* element of murder, and it does not by itself establish any valid theory of liability.  "If only *one* element of the offense is established by the record, the petitioner could still be correct that he or she could not currently be convicted of the relevant offense based on the absence of *other* elements."  (*Id.* at p. 463.)

The court then explained why Curiel's jury's verdict, potentially reached under the natural and probable consequences doctrine, and its special circumstance findings did not establish all the elements under a still-valid direct aiding and abetting theory.  (*Curiel, supra*, 15 Cal.5th at pp. 466–468.)  The court observed an aider and abettor must "know the direct perpetrator intends to commit the murder or life-endangering act and intend to aid the direct perpetrator in its commission."  (*Id.* at p. 468.)  "Because the jury was instructed on the natural and probable consequences doctrine, the jury was required to find only that Curiel knew that [his accomplice] intended to commit one of the underlying target offenses and that Curiel intended to aid him in *that* offense, not murder. Nor was the jury required to find that the underlying target offenses, themselves, were

21.

dangerous to human life." (*Ibid.*) As a result, the jury had not necessarily found that Curiel had the requisite knowledge and intent as to his accomplice's conduct for purposes of direct aiding and abetting, and, as such, the record did not conclusively refute Curiel's petition allegations.

*Curiel*'s observation that all elements of murder under a valid theory are placed at issue by a petition's properly pleaded allegations was an explanation of the showing necessary to conclusively refute the petition allegations at the prima facie stage where an underlying jury had been instructed under a now-invalid theory, not that Curiel was free to raise any new defense at a subsequent evidentiary hearing wholly untethered to the changes in the law under sections 188 and 189.

Any entitlement to resentencing is conditioned upon a showing that the petitioner could not presently be convicted of murder or attempted murder "because of" changes in the law under Senate Bill 1437. (§ 1172.6, subd. (a)(3).) A defense presented for the first time at the evidentiary hearing, with no relevance to the changes in the law under Senate Bill 1437 and unrelated to factual disputes raised by the petition, is outside the scope of section 1172.6. (*Gomez v. Superior Court* (2024) 100 Cal.App.5th 778, 787 [while the trial court acts as an independent factfinder in this context, the court's factual determinations are "limited to the issues made relevant by the changes to the law effected by Senate Bill No. 1437"]; cf. *People v. Mares* (2024) 99 Cal.App.5th 1158, 1168 [at prima facie stage, new evidence of misidentification could not support resentencing because it does not show the petitioner cannot be convicted "'because of'" changes to the law as required under § 1172.6].)

Finally, the identity of the men present at Polk's door during the shooting was one of the central issues decided by the jury at the original trial. By virtue of the jury's verdict, including its true finding that Edmundo was a principal in the commission of the murder for purposes of the firearm enhancement under section 12022.53, subdivision (e)(1), the jury necessarily rejected Edmundo's theory that he was

misidentified as one of the men involved in Polk's shooting. At a section 1172.6 evidentiary hearing, "the trial judge is charged with determining, beyond a reasonable doubt, if the petitioner is guilty of murder under a theory that remains valid after the amendments to the substantive definition of murder." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 952.) In other words, the sole question at a section 1172.6 evidentiary hearing "is whether the petitioner committed murder under a still-valid theory .…" (*People v. Clements* (2022) 75 Cal.App.5th 276, 294.) The evidentiary hearing is "'not a trial *de novo* on all the original charges.' [Citation.] Rather it is a *postconviction* … "'act of lenity" [citation], allowing for the retroactive application of the new law governing accomplice liability .…'" (*People v. Williams* (2020) 57 Cal.App.5th 652, 661.) Although both parties may present new evidence, the purpose of section 1172.6 "'is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.'" (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947.)

In sum, the trial court did not err in declining to consider Edmundo's new alibi evidence and defense at the evidentiary hearing.

## III. Substantial Evidence

Edmundo contends there is no substantial evidence to support the trial court's finding that he remained guilty of murder, beyond a reasonable doubt, under a valid murder theory. The Attorney General maintains there is substantial evidence to support either a direct perpetrator theory (Edmundo was the shooter), or an aiding and abetting theory. The Attorney General does not address Edmundo's argument as to liability for felony murder under section 189, subdivision (e)(3).

### A. Standard of Review

"When a defendant challenges the sufficiency of the evidence, "'[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible,

and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.”’” (*People v. Clark* (2011) 52 Cal.4th 856, 942–943.) “‘Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.’” (*Id.* at p. 943.) A court must “‘“‘presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.’”’” (*Ibid.*)

“Appellate inquiry into the sufficiency of the evidence ‘does not require a court to “ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.” [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’” (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 (*Nguyen*).) “‘Our job on review is different from the trial judge’s job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder’s findings beyond a reasonable doubt.’” (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480.) “Where the circumstances reasonably justify the trier of fact’s findings, a reviewing court’s conclusions the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment’s reversal.” (*People v. Zamudio* (2008) 43 Cal.4th 327, 358.)

### B. Felony Murder

The trial court made an alternative finding that Edmundo was guilty of felony murder as a major participant who acted with reckless indifference to human life pursuant to section 189, subdivision (e)(3). As an initial matter, we agree with Edmundo that this first degree felony-murder theory is unsupported by the evidence.

Section 189, subdivision (a), divides murder into degrees, and provides that "All murder that is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or that is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 287, 288 or 289, or former Section 288a, or murder that is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree."

Pursuant to section 189, subdivision (e), "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2" (*Ibid.*)

In this case, there is no evidence the three men who went to Polk's apartment were involved in the perpetration or the attempted perpetration of any qualifying felony in section 189, subdivision (a).  As such, there are no facts to sustain a theory of first degree felony murder under section 189, subdivision (e)(3).  (See *People v. Burgess* (2023) 88 Cal.App.5th 592, 606 ["[b]ecause there is no felony to predicate [the] defendant's felony murder conviction upon, insufficient evidence support[ed] the trial court's finding that [the] defendant is guilty of murder under current law"]; see also *People v. Gentile, supra*, 10 Cal.5th at p. 848 [observing felony-murder liability under § 189, subd. (e), was not at

issue for purposes of § 1172.6 because the petitioner had not been involved in a qualifying felony].)

### C. Substantial Evidence Supports Trial Court's Finding Edmundo is Guilty of Murder Under an Aiding and Abetting Theory

Edmundo argues there is no substantial evidence to support the trial court's finding that he is guilty of murder as either the shooter or as an aider and abettor, which the Attorney General disputes.

The trial court found beyond a reasonable doubt that Edmundo was *either* the actual killer who acted with malice aforethought, or if he was not the actual killer, that he acted to aid, abet, or assist Ernesto in the commission of the murder and did so with the intent to kill. This finding necessarily rests on application of the aider and abettor doctrine because it reflects uncertainty about whether Edmundo was in fact the direct perpetrator who shot and killed Polk—not a finding that he was the direct perpetrator beyond a reasonable doubt.

As observed in *McCoy*, "the dividing line between the actual perpetrator and the aider and abettor is often blurred. It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor…. The aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own. It obviates the necessity to decide who was the aider and abettor and who [was] the direct perpetrator or to what extent each played which role." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120; see *People v. Santamaria* (1994) 8 Cal.4th 903, 932–933 (conc. & dis. opn. of Mosk, J.) [explaining that murder liability may be proven under an unspecific theory that although the defendant's precise role could not be determined, the defendant could be *either* a direct and active perpetrator *or* an aider and abettor].) In this case, there was evidence of only one shooter who killed Polk. The identity of the shooter was contested, and the only percipient witness to the shooting itself identified both Ernesto and Edmundo as the shooter on different occasions. So long as there was

substantial evidence supporting it, the aider and abettor doctrine obviated the need for the trial court to determine Edmundo's exact role in the shooting to find him guilty of murder. (*People v. McCoy, supra*, at p. 1120.; accord, *People v. Gomez* (2018) 6 Cal.5th 243, 279 (*Gomez*).) Edmundo argues there is insufficient evidence to support a conviction under the aiding and abetting theory.

A person may be liable for a criminal act as an aider and abettor. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216). Under section 31, "principals" in a crime include persons who "aid and abet in its commission, or, … have advised and encouraged its commission …." (*Ibid.*) Whether a person has aided and abetted in the commission of a crime is ordinarily a question of fact. (*Nguyen, supra*, 61 Cal.4th at p. 1054; accord, *People v. Chhuon* (2026) __ Cal.5th __, __ [2026 Cal.Lexis 3009].) "'A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."'" (*Nguyen, supra*, at p. 1054*;* accord, *Curiel, supra*, 15 Cal.5th at p. 466.) Thus, aider and abettor liability "requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

"Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider in assessing a defendant's criminal responsibility." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529–530.) While gang evidence "'standing alone cannot prove a defendant is an aider and abettor to a crime,'" it can strengthen inferences arising

from other evidence specific to the defendant's role in the crime at issue. (*Nguyen, supra*, 61 Cal.4th at p. 1055.)

The requisite intent of an aider and abettor may be formed either before or during the commission of the crime (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039), and, because there is rarely direct evidence of a perpetrator's intent, the necessary intent may be inferred from circumstantial evidence (*Nguyen, supra*, 61 Cal.4th at p. 1055).

### 1.  Actus Reus

Edmundo argues there is no substantial evidence he did or said anything to aid and abet the fatal shooting.  Three men crept up the stairs, the shooter pulled out a gun and pointed it at Polk, and, after a brief struggle with Polk over the gun, ultimately shot and killed Polk.  But there is no evidence either of the two men with the shooter did or said anything before the shooting that in fact assisted with the crime.  Edmundo argues the evidence shows only that there were two people with the shooter at the scene, nothing more.

The Attorney General does not address the issue of actus reus directly in arguing there is substantial evidence that Edmundo aided and abetted the shooting, but he notes the surrounding circumstances:  Edmundo had a motive for killing Polk in retaliation for the fight earlier in the day; Edmundo was overheard talking with Ernesto about retaliation against Polk before the shooting; and Ernesto, Edmundo, and another man crept up to Polk's apartment.

The actus reus component of aiding and abetting is satisfied where the aider and abettor "by act or advice aids, promotes, encourages or instigates, the commission of the crime."  (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)  In other words, the question is "whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged him by words or gestures."  (*People v. Villa* (1957) 156 Cal.App.2d 128, 134.)  Our Supreme Court has emphasized that liability for aiding and abetting "'*require*[*s*] *some affirmative action*'" that assists or encourages the commission of the

crime. (*People v. Partee* (2020) 8 Cal.5th 860, 868.) "A person present at the scene of a crime—even one who is the criminal's companion, knows a crime is being committed, fails to prevent it, and later expresses approval of it—is not guilty of aiding and abetting the crime if he takes no action to aid or encourage the crime." (*In re K.M.* (2022) 75 Cal.App.5th 323, 329 (*K.M.*), citing *In re Michael T.* (1978) 84 Cal.App.3d 907, 910–911 & *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262, 1278–1279 (*Juan H.*).) The act or advice that is the actus reus need not be a substantial factor in the offense (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743), and there is no requirement that the act or advice be a but-for cause or even an essential factor in bringing about the offense (*People v. Franzen* (2012) 210 Cal.App.4th 1193, 1216).

In determining whether the aider and abettor's conduct or words satisfies the actus reus component, the factfinder may consider the aider and abettor's "'presence at the scene of the crime, companionship, and conduct before and after the offense.'" (*Nguyen, supra*, 61 Cal.4th at p. 1054.) The factfinder may also consider flight after the crime because it *may* bear on consciousness of guilt. (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1095 [flight reasonably viewed as consciousness of guilt where aider and abettor did not immediately disassociate with the group, but was in their presence shortly after fleeing the crime]; cf. *People v. Lara* (2017) 9 Cal.App.5th 296, 323 [flight after the crime did not signal consciousness of guilt under the circumstances, but rather "simple self-preservation or a desire to disassociate themselves from what had just occurred"].)

There is substantial circumstantial evidence to infer that even if Ernesto (or the other unidentified man) was the shooter, Edmundo was present in the group at Polk's apartment, and his presence was intended to, and did in fact, aid and assist the shooter. (*Nguyen, supra*, 61 Cal.4th at p. 1055 [while mere presence at the scene is not enough to establish aiding and abetting, it may be considered along with other evidence].) Myeisha identified Edmundo and Ernesto as two of the men at the apartment. She identified Edmundo as the shooter, but later testified Ernesto was the shooter, and Edmundo was

29.

one of the men with Ernesto. Although she was inconsistent in her identification of the shooter, she invariably identified Edmundo as at least *present* with the shooter, even if he was not the shooter. (*People v. Jones* (2013) 57 Cal.4th 899, 963–964 [testimony of single witness may constitute substantial evidence so long as not physically impossible or inherently improbable].)

Substantial evidence showed Edmundo and Ernesto had a motive to retaliate against Polk—which, pursuant to the expert's gang testimony, included shooting and killing him. The gang expert testified both Edmundo and Ernesto were active Bulldog gang members, and their discussion of retaliation after the fight was consistent with the expert's testimony that a gang would retaliate for the type of gang-rival fight that had occurred earlier in the day. Moreover, the expert testified the retaliation might not be limited to rival gang members, but could extend to anyone, including a non-gang member who was perceived to have assisted the rival gang. The gang expert also opined gang retaliation was not always proportional to the inciting incident, and could include a homicide.

Duan's testimony and Israel's statements to police indicated Edmundo and Ernesto were discussing retaliation against Polk earlier in the evening—and Israel apparently took the comments he heard seriously because he warned Myeisha the Bulldogs were going to kick in Polk's door. Mere hours after their comments about retaliation against Polk, Edmundo and Ernesto were identified by Myeisha as two of the three men in the group who came to Polk's door at the time of the shooting, so there was a temporal connection between their comments and the shooting. Beyond that, not only were Edmundo and Ernesto fellow gang members, with a gang motive to retaliate against Polk for his perceived assistance to the Crips gang, they were also half brothers; a factfinder could conclude this would add to Edmundo's incentive to aid in seeking retaliation against Polk. (*Nguyen, supra*, 61 Cal.4th at p. 1054 [companionship among the factors that may be considered to determine aiding and abetting liability].) Taking this evidence together,

a factfinder reasonably could conclude Edmundo accompanied Ernesto and a second man in a joint undertaking to retaliate against Polk.

The gang fight earlier in the day where Ernesto was beaten included multiple members of both rival gangs, thus a factfinder could reasonably infer the shooter desired to have reinforcements to confront Polk—the group would not necessarily have known how many people or potential Crips members they would confront in Polk's apartment. Myeisha saw the men sneaking up the staircase, giving rise to a reasonable inference they wished to surprise Polk, and sneaking up the stairs around midnight aided their ability to conduct the shooting without first drawing the attention of neighbors or anyone else who might forewarn Polk or intercede.

The circumstances of this case distinguish it from other cases where no substantial evidence supported the actus reus element of an aiding and abetting theory. For example, in *K.M.*, the victim "could only guess" at what actions K.M. may have taken to aid the group who robbed the victim. (*K.M., supra*, 75 Cal.App.5th at p. 329.) In contrast here, there were preshooting circumstances strongly establishing Edmundo's motive to retaliate against Polk, Edmundo was seen with the group creeping toward Polk's apartment in the middle of the night to make a surprise attack on Polk, and, given the gang circumstances, Edmundo's presence could also be inferred to provide backup and support to the shooter if they encountered multiple gang members in or near Polk's apartment. In *Juan H.*, there was very little evidence showing Juan H. (the purported aider and abettor) had a retaliatory motive to aid and abet the murder; and the surrounding circumstances showed only that Juan H. knew his brother was armed and ready to confront the victim—not that his brother, without provocation, would murder the victim during the confrontation. (*Juan H., supra*, 408 F.3d at pp. 1277–1278.) Here, there is strong evidence of Edmundo's motive, and the stealth approach on Polk in the middle of the night, along with the speed at which the shooter aimed the gun at Polk,

strongly suggest the group was acting in concert with a common purpose, and knew the shooting was the goal of the ambush.

Considering the circumstances as a whole, and the inferences drawn from them, there is substantial evidence of Edmundo's affirmative conduct that aided the shooting. He crept up the stairs with the group to Polk's apartment (the retaliation target he and Ernesto had been discussing earlier in the evening), assisting the shooter in making a surprise attack on Polk. Moreover, the circumstances of the earlier gang fight permit an inference Edmundo's presence with the shooter was intended to (and did) provide encouragement and backup in case the shooter confronted multiple individuals and potential gang rivals at Polk's apartment. (See *Gomez, supra*, 6 Cal.5th at pp. 278–279 [even though his role as shooter or aider and abettor could not be determined, the evidence showed the defendant was part of a joint undertaking with another accomplice to shoot the victim as part of a predetermined plan, including talking to each other as they snuck up on the victim and identifying the victim for the shooter].)

### 2.    Mens Rea:  Knowledge and Intent

It is not enough that Edmundo's presence and sly approach with the group to Polk's residence in fact aided the shooting, there must also be substantial evidence Edmundo acted with knowledge of the direct perpetrator's unlawful purpose and intended that his conduct would aid or facilitate the crime. (*People v. Perez, supra*, 35 Cal.4th at p. 1225 [aider and abettor must have "knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends"].) Edmundo argues there is no evidence he intended to kill Polk or that the shooter intended to kill Polk, nor is there evidence he intended to assist the shooter in killing Polk.

We disagree. There is substantial evidence that Edmundo accompanied the group to Polk's apartment knowing the shooter intended to shoot and kill Polk, and that Edmundo intended to aid the shooter in achieving that goal. First, Edmundo had a motive to kill Polk as retaliation for the gang fight earlier, believing Polk assisted the

32.

Crips who had beaten Ernesto. Maurice (a rival Crips member) was headed to Polk's apartment that morning when he first exchanged hostilities with Bulldog members, including Edmundo. While Maurice was in Polk's apartment after he had exchanged words with Edmundo and other Bulldog gang members, a crowd of people had gathered beneath Polk's apartment and were taunting Maurice, precipitating Maurice to call his own gang member friends, which ultimately led to the fight. Duan testified the man who beat Ernesto appeared to come from the direction of Polk's apartment. After the fight, men gathered under Polk's balcony and were barking like dogs. Later, witnesses heard Edmundo and Ernesto discussing retaliation against Polk, and one witness went to warn Myeisha they were planning something. A gang expert testified retaliation for a gang fight of this type could include homicide, and the retaliation could be aimed at anyone who was perceived to have helped the rival gang. As Ernesto and Edmundo were fellow gang members, and half brothers, there was substantial evidence Edmundo had a motive to retaliate against Polk, up to and including, killing him.

Second, only hours after Edmundo and Ernesto were heard discussing retaliation against Polk, Myeisha identified Edmundo and Ernesto as two of the three men who crept up to Polk's apartment and shot him. Myeisha's testimony she saw the group of men sneaking up the stairs towards Polk's apartment lends itself to an inference the attack on Polk was coordinated. In addition to Edmundo and Ernesto's status as half brothers and fellow gang members, this circumstantial evidence supports an inference the group undertook their approach as a joint enterprise, sharing a common purpose.

Third, in conjunction with this evidence, there was substantial evidence Edmundo knew the shooter meant to kill Polk, not merely confront him with a gun. Myeisha described the group creeping quietly up the stairs to Polk's apartment in the middle of the night, and when Polk appeared at the door, the shooter's gun immediately came up and was pointed at Polk. From this it could be inferred the shooter had the gun out and ready

to fire, which was why the group was sneaking up to Polk's apartment, trying to retain the element of surprise and avoid detection by any of the neighbors.

Finally, the manner of the shooting strongly evidences an intent to kill, not merely an accidental shooting after Polk reached for the gun. Although Polk initially struggled for the gun with the shooter, he was shot four times, one of which was in the buttocks at such an angle the pathologist opined Polk was likely bent over—giving rise to an inference the shooter continued to shoot even after Polk had turned away and was bent down and no longer struggling for the gun. There was also no stippling around this gunshot wound, indicating it was fired from at least 30 inches (or farther) away from the victim. Indeed, there was no stippling around three of the four shots that hit Polk, showing the shooter was farther away than 30 inches. This gives rise to a reasonable inference the shooter fired multiple times at Polk after he was no longer struggling for the gun. From this evidence, a factfinder could reasonably conclude the shooter was aiming to kill the victim—the goal was not merely to threaten or scare Polk, nor was it an accidental shooting during the struggle for the gun. (See *People v. Smith* (2005) 37 Cal.4th 733, 742 [shooter's "purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill"]; see also *People v. Covarrubias* (2016) 1 Cal.5th 838, 892 [discharging .38-caliber handgun multiple times from close range in manner that could have inflicted mortal wound supported requisite intent to kill finding]; accord, *People v. Silva* (2001) 25 Cal.4th 345, 369 ["multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to [the] defendant—is entirely consistent with a premeditated and deliberate murder"].)

Edmundo's relationship with Ernesto, the gang motive to seek retribution against Polk, the coordinated, stealth approach of the group (which included Ernesto and Edmundo) to Polk's apartment, the immediate manner in which the gun was pointed at Polk, and Polk being shot four times in a manner suggesting Polk was in retreat after the

34.

struggle, all supports a conclusion Edmundo snuck up with the group to Polk's apartment in an effort to aid and encourage the shooter in killing Polk, knowing and intending to support that purpose.

### D. Direct Perpetrator Theory

We do not consider whether there was substantial evidence that Edmundo was the direct perpetrator who shot and killed Polk. The trial court's finding that Edmundo was either the direct perpetrator or aided and abetted the shooter necessarily indicates the court was uncertain whether Edmundo was in fact the direct perpetrator. A finding that Edmundo may have aided and abetted the shooting undermines any conclusion Edmundo was the direct perpetrator beyond a reasonable doubt. Consistent with the underlying jury verdict, the trial court concluded Edmundo was guilty of murder beyond a reasonable doubt because he acted as *either* the shooter who killed with express malice, *or* he aided and abetted the shooter with express malice. Thus, regardless of his exact role in the shooting, he was guilty of second degree murder beyond a reasonable doubt.

Moreover, as substantial evidence supports the finding Edmundo aided and abetted the shooting, and the trial court did not err in denying the petition on that ground, there is no basis to reach a direct perpetrator theory and the parties' related collateral estoppel arguments.

## IV. Remaining Arguments

As we conclude there is substantial evidence to support the trial court's finding that Edmundo acted as a direct aider and abettor in Polk's murder, we do not reach the parties' additional contentions regarding implied malice murder.

## DISPOSITION

The trial court's order denying the petition is affirmed.


                                                MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


DESANTOS, J.